# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                                      Case No. 06-Cr-011

ROY LEE MONETTE,

    Defendant.

## MAGISTRATE JUDGE'S RECOMMENDATION TO THE HONORABLE RUDOLPH T. RANDA

## NATURE OF CASE

On January 18, 2006, a federal grand jury sitting in this district returned a four-count indictment against defendant Roy Lee Monette. The defendant is charged in Count One of the indictment with knowingly and intentionally possessing with intent to distribute a mixture and substance containing cocaine base in the form of "crack" cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Count Two charges the defendant with knowingly and intentionally possessing with intent to distribute a mixture and substance containing heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Count Three charges the defendant with knowingly possessing a firearm in furtherance of the drug trafficking crimes charged in Counts One and Two, in violation of 18 U.S.C. § 924(c)(1)(A)(I). In Count Four, the defendant is charged with being a convicted felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

On January 27, 2006, the defendant appeared before this court for arraignment, entering a plea of not guilty. Pursuant to the pretrial scheduling order issued at that time, the defendant has filed a motion to suppress statements and evidence seized from 3215 N. 29th Street, Milwaukee, Wisconsin, on November 23, 2005. (Docket #13). This motion will be addressed herein.

## MOTION TO SUPPRESS STATEMENTS AND EVIDENCE SEIZED IN SEARCH

Defendant Roy Lee Monette moves this court to suppress for use at trial all custodial statements he made to the City of Milwaukee police officers on November 23, 2005, and to suppress for use at trial any evidence seized from 3215 N. 29th Street, Milwaukee, Wisconsin. The government opposes the motion.

On March 14, 2006, the court conducted an evidentiary hearing on the defendant's motion. At the hearing, the following individuals testified: David Metz of the Milwaukee Police Department (MPD), MPD Officer Jose Viera and defendant Roy Lee Monette. Based on the evidence presented at the hearing, the court makes the following findings of fact.

### Findings of Fact

On November 23, 2005, Milwaukee Police Detective David Metz, who was in an undercover police vehicle, was conducting surveillance on the defendant's residence at 3215 N. 29th Street, Milwaukee, Wisconsin. The surveillance was part of an investigation involving an individual known as "Black," who had previously sold heroin to an undercover police officer. Detective Metz' vehicle was parked near the defendant's residence. Based on a prior conversation with undercover Milwaukee Police Officer Enk, Detective Metz was aware that the undercover officer was going to buy heroin from the defendant that day. Officer Jose Viera and

Detective Brett Kohnert were also on surveillance in an unmarked van. They were parked around the corner from where the controlled buy was to take place, near 28th Street, just north of Auer Avenue. At about 7:13 p.m., Detective Metz received word that the undercover officer had purchased the drugs from the defendant.

Detective Metz advised Officer Viera that the controlled buy had taken place and told him to arrest the defendant. The officers exited their vehicle at that point. They were about ten feet from the defendant when they exited the vehicle. Detective Metz began driving his vehicle toward the location of the controlled buy and observed the defendant walking toward Officer Viera's vehicle.

The defendant was walking down the street and walked behind the undercover van. According to Officer Viera, he called out, "Police, police, get down on the ground." Detective Kohnert brought the defendant down to the ground. The defendant was handcuffed and placed in custody. The defendant was arrested at about 7:15 p.m.

At the time, Officer Viera testified that he and Detective Kohnert were in plain clothes wearing jeans, sweatshirts and jackets. Officer Viera had a velcro badge attached to the left lapel of his jacket with the word "Police" on it. He also had a badge hanging from his neck. Detective Kohnert was wearing a jacket with the word "Police" on it. Officer Viera testified that no weapons were drawn or batons used on the defendant. Detective Metz, who was observing the defendant's arrest, testified that no weapons were pointed at the defendant.

After the defendant was handcuffed, Officer Viera told him to stand up and the defendant complied. The defendant did not resist arrest or become verbally abusive to the officers, although he was not pleased about being handcuffed and searched.

After the defendant stood up, Officer Viera asked the defendant his name and whether he had anything with him that could hurt the officer when he did his search. The defendant told him, "no." Officer Viera asked the defendant what he was doing in the area. Officer Viera then conducted a pat-down search of the defendant which took about six to seven minutes. He made the defendant take off his shoes as part of the search. Officer Viera took the defendant's keys, money and cell phone. No drugs were found on the defendant.

The defendant remained on the street for about 15 minutes before he was placed in the undercover police van by Officer Viera. The van, which is approximately 14 feet long and six feet wide, has a side door with two benches on the inside. Officer Viera and Detectives Metz, Kohnert and Klemstein also entered the van. Officer Viera squatted between the benches and the other officers sat on the benches with the defendant, who remained handcuffed. All of the officers in the van were armed, but their weapons were not displayed.

According to Officer Viera, he orally advised the defendant of his Miranda[1] rights from memory; he did not read them from an advice of rights card. Officer Viera then testified that he asked the defendant if he understood his rights and defendant nodded his head and said, "yeah." Officer Viera then asked the defendant: "Knowing these rights, do you want to talk about what happened tonight?" The defendant nodded his head and responded, "Yeah."

The defendant was asked background information, including his address, social security number and where he worked. Officer Viera testified that the defendant said he lived in the back upstairs unit at 3215 N. 29th Street.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

- 4 -

The defendant had no difficulty understanding or answering the questions and did not appear to have been drinking or high on drugs. No injuries were observed on the defendant and he appeared to be normal. According to Detective Metz, the defendant did not ask for an attorney or invoke his right to counsel. Detective Metz told the defendant that he was in trouble and that he was facing big penalties. He asked the defendant if he had information about anyone else involved in drug dealing.

After the defendant waived his rights, Detective Metz asked the defendant if he had heroin or crack cocaine in his residence. According to Detective Metz, the defendant responded that there was some crack in the house, but that it was not his. He explained that someone had dropped it off at his home. Detective Metz testified that he asked the defendant if anyone else stayed at the residence with him. Detective Metz testified that the defendant said that his girlfriend stayed there, but that she did not know anything about the drugs. He also told Detective Metz that he did not want her to get hurt.

Detective Metz testified that he then asked the defendant if he could go in and get the drugs. He asked the defendant for consent to search his residence for drugs. According to Detective Metz, the defendant gave his consent, telling the officers to go ahead and do what they had to do. He just did not want to get his girlfriend in trouble. The defendant was never asked to sign a written consent form.

Detective Metz testified that the defendant did not appear to be reluctant to give consent and that he placed no limitations on his consent to search. No threats or promises were made to the defendant to get him to give consent, nor did the defendant ever complain about his treatment by the officers.

- 5 -

Case 2:06-cr-00011-JPS   Filed 04/06/06   Page 5 of 16   Document 19

Detective Metz testified that after the defendant consented to the search of his residence, he and Detective Klemstein went into the residence. Officer Viera and Detective Kohnert stayed in the van with the defendant. Detective Kohnert asked the defendant if there were guns or large amounts of cash in the house. The defendant said he had a gun in his residence.

The officers did not ask the defendant if he had mental health problems or was on medication. They did not ask him his educational level or whether he received social security benefits. The defendant remained in the van for about 45 minutes before a squad car came to transport him to the police station.

The officers did not attempt to get a search warrant, although there was no reason why they could not have obtained one. Obtaining consent to search is a more expedient way to proceed.

The defendant's testimony was diametrically opposed to that of the officers in several significant respects. He testified that an unmarked van stopped near 28th Street and Auer Avenue as he was walking nearby. Two men with ski masks jumped out of the van, said "freeze," tackled him and put him on the ground. The defendant thought he was being robbed. According to the defendant, one of the men was pointing a gun at him.

The defendant testified that the men then identified themselves as police officers and rolled up their ski masks after he was in custody. The officers searched him and took his money, keys and cell phone. The defendant was then placed in a van with four police officers.

According to the defendant, he was not advised of his Miranda rights either in the street or in the van, although he knows what Miranda warnings are from his prior arrests. The defendant testified that the officers told him that he would be in serious trouble if he did not

"give up anyone." He also testified that the four officers in the van took turns questioning him and that he "had so much coming at him at one time." They asked him about other drug dealers and told him he would receive more time if he did not cooperate. The defendant said he was getting nervous with all of the questioning.

The defendant denied that he told the officers there was heroin and crack in his house or that he gave the officers consent to search his home. He specifically denied telling the officers to do what they had to do. The defendant testified that he did not say anything to the officers about his girlfriend, but that the officers learned who stayed at the house from the mail they found in the house.

The defendant testified that at one point two officers left the van. One officer later returned to the van with a photograph which showed items from the defendant's home. The officer told the defendant he was in trouble.

The defendant also testified that he is being treated for mental illness and suffers from schizophrenia and paranoia. The defendant takes Prozac and two other medications. Initially the defendant testified that he took his medications on November 23, 2005. However, he subsequently testified that he could not remember whether he took his medications that day. The defendant is only about three or four courses short of receiving his high school equivalency diploma.

## **Analysis**

### Advice of Rights

The defendant asserts that he was not advised of his Miranda rights before being questioned in the back of an undercover police van following his arrest. He also contends in

his motion that "his statements to Milwaukee Police that he understood his rights was coerced" and that he did not voluntarily waive his rights. (Defendant's Motion to Suppress at 4).

The Fifth Amendment privilege against self-incrimination and the right to counsel require police to follow certain procedural safeguards during custodial interrogations of a suspect. Miranda v. Arizona, 384 U.S. 436 (1966). Here, there is no dispute that the defendant was under arrest and in custody at the time he was questioned by law enforcement officers. Thus, the issues before the court are whether the defendant was advised of his Miranda rights and if so, did he voluntarily waive his rights.

At the core, the defendant's motion to suppress presents a credibility issue. Thus, this court must make a credibility determination about the testimony of the defendant and the officers.

With respect to Miranda rights, Officer Viera testified that he orally advised the defendant of his rights from memory after the defendant was placed in the van. He did not use an advice of rights card or ask the defendant to sign a written waiver of rights. Officer Viera said that he then asked the defendant, "Knowing these rights, do you want to talk about what happened tonight?" According to Officer Viera, the defendant nodded his head and said, "Yeah." Detective Metz, who was in the van at the time, also testified that the defendant was advised of his rights and that he waived those rights. Both Officer Viera and Detective Metz testified clearly and unhesitatingly. They are experienced law enforcement officers and were well aware of their responsibility to advise defendants of their rights before initiating any investigation.

In contrast, the defendant denied that he was ever advised of his rights, either in the van or when he was placed under arrest on the street. He testified that as he was walking down

- 8 -

the street, two men, who were wearing ski masks that covered their faces, jumped out of a vehicle, said "freeze," and then tackled him and put him to the ground. The defendant thought he was being robbed. According to the defendant, after he was on the ground, the officers rolled up the ski masks so that their faces were visible. When he was placed in the van with the four officers, he said the officers questioned him and told him that he was in serious trouble.

The court finds the defendant's testimony about the officers wearing ski masks when they confronted him less than credible. It strains belief that the officers wore ski masks pulled over their faces and then rolled up those masks so their faces were visible once the defendant was on the ground. The officers had no reason or motive to disguise themselves when approaching the defendant, especially since the defendant testified that they removed the masks after he was in custody. On the other hand, the defendant had much to gain by persuading the court that he was not advised of his constitutional rights. Upon balance, the court finds the testimony of Officer Viera and Detective Metz more credible and concludes that the defendant was advised of his Miranda rights by Officer Viera.

The court also must determine whether the defendant knowingly and voluntarily consented to waive his Miranda rights. Officer Viera and Detective Metz testified that the defendant voluntarily waived his rights and consented to answer the officer's questions. The defendant denies that he waived any rights.

It is well-established that a statement is not "compelled" within the meaning of the Fifth Amendment if an individual "voluntarily, knowingly and intelligently" waives his constitutional privilege. Miranda, 384 U.S. at 444. "The inquiry whether a waiver is coerced 'has two distinct

- 9 -

dimensions.'" Colorado v. Spring, 479 U.S. 564 (1987) (quoting Moran v. Burbine, 475 U.S. 412, 421 [1986]). As the Court explained in Moran:

> "First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."

475 U.S. at 421 (internal citations omitted).

To determine whether a defendant voluntarily consented to waive his rights, the court must inquire whether, under the totality of the circumstances, law enforcement officers have overborne the will of the accused. Haynes v. Washington, 373 U.S. 503, 513-14 (1963); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The court in Schneckloth detailed the factors to be considered when evaluating whether a defendant's "will was overborne" in the giving of statements:

> [T]he Court has assessed the totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account include the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.

412 U.S. at 226 (internal citations omitted).

The fragile emotional state of the accused at the time consent is given is a factor bearing on the issue of voluntariness. United States v. Duran, 957 F.2d 499, 503 (7th Cir. 1992). However, the fact that the accused is extremely upset at the time he consents is not dispositive. Id. Unless the "emotional distress is so profound as to impair [a person's]

- 10 -

capacity for self-determination or understanding of what the police were seeking, it is not enough to tip the balance." Id.

In this case, the evidence fails to show that the defendant's decision to waive his constitutional rights was not voluntarily made. Although the defendant states in his brief that his statements to police were coerced, the defendant alleges no "coercion of a confession by physical violence or other deliberate means calculated to break [his] will." Colorado v. Spring, 479 U.S. at 573-74 (quoting Oregon v. Elstad, 470 U.S 298, 312 [1985]).

The evidence establishes the officers did not have their weapons drawn or batons displayed when the defendant was in the van. The defendant was handcuffed. No threats or promises were made to the defendant to obtain his consent. The defendant was not physically assaulted. Both Officer Viera and Detective Metz testified that the defendant was basically cooperative and appeared calm. The defendant did not request an attorney, nor did he complain about his treatment. Merely pointing out the obvious – that the defendant was in serious trouble given that he had just completed a drug deal – is not sufficient for this court to conclude that the defendant's waiver of his rights was coerced. See e.g., United States v. Ramirez, 112 F.3d 849, 853 (7th Cir. 1997) (telling a defendant "that cooperation with the police can result in a reduced sentence or other concession is not a promise and is not calculated to prevent the suspect from rationally considering whether or not to speak.")

Moreover, although the defendant has been diagnosed as suffering from schizophrenia and paranoia, he is on medication and there is no indication that he was unable to understand the officer's statements and questions. He testified that the officers took turns questioning him and that he had so much coming at him at one time. However, both officers testified that the

- 11 -

defendant had no difficulty understanding them and that there was no evidence that the defendant had been drinking or had taken illegal drugs.

There is was no evidence of duress or coercion used by the officers to induce the defendant to waive his rights. Absent evidence that the defendant's will was overborne and his capacity for self-determination critically impaired because of coercive police conduct, the court concludes that the defendant's decision to waive his Fifth Amendment privilege was voluntary.

The court also concludes that the defendant's waiver of his Fifth Amendment rights was knowingly and intelligently made. The defendant testified that he was aware of his Miranda rights from his prior contact with police, Thus, the defendant acknowledged that he was knew, among other rights, that he did not have to talk to the officers. There is no indication that the defendant misunderstood the consequences of waiving his rights and speaking with the officers. There is no evidence that the defendant was unable to intelligently waive his rights. The defendant is only a few courses short of receiving his high school equivalency diploma. Accordingly, the court concludes that the defendant's waiver of his rights was made knowingly and intelligently within the meaning of Miranda.

In sum, the court finds the officers' testimony that the defendant waived his Miranda rights more credible. Despite the defendant's denial, the court has determined that the defendant was advised of his constitutional rights. There is no evidence that the defendant was coerced or threatened in any way into waiving his rights. Considering the relevant factors, including the defendant's mental issues, the defendant's waiver of his rights was made voluntarily, knowingly and voluntarily.

### Consent to Search

The defendant maintains that he did not give voluntary consent to MPD officers to search his residence at 3215 N. 29th Street. The government disputes the defendant's contention.

It is well established that warrantless searches are per se unreasonable under the Fourth Amendment, but are subject to specific exceptions. Mincey v. Arizona, 437 U.S. 385, 390 (1978); United States v. Robles, 37 F.3d 1260, 1263 (7th Cir. 1994). One of the exceptions to this general rule permits law enforcement officers conducting a search to enter a dwelling without a warrant if they obtain voluntary consent either from the individual whose property is to be searched or from a third party possessing common authority or joint control over the premises. United States v. Saadeh, 61 F.3d 510, 517 (7th Cir. 1995); United States v. Rosario, 962 F.2d 733, 736 (7th Cir. 1992) (citing Schneckloth v. Bustamonte, 412 U.S. 218 [1973] and United States v. Matlock, 415 U.S. 164 [1974]); see also, Florida v. Jimeno, 500 U.S. 248 (1991).

The standard for measuring the scope of an individual's consent under the Fourth Amendment "is that of 'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Jimeno, 500 U.S. at 251; Illinois v. Rodriguez, 497 U.S. 177 (1990); United States v. Dorsey, 27 F.3d 285 (7th Cir. 1994). The scope of a search is generally defined by its expressed object. Jimeno, 500 U.S. at 251; United States v. Ross, 456 U.S. 798 (1982). Moreover, consent searches are valid only if the consent was freely and voluntarily given. Schneckloth v. Bustamonte, 412 U.S. at 222; Saadeh, 61 F.3d at 517.

- 13 -

A person's knowledge of his right to refuse is not a prerequisite of a voluntary consent. Schneckloth, 412 U.S. at 234. Thus, the subject of a Fourth Amendment search need not be aware of the right to refuse to give knowing and voluntary consent. Lenz v. Winburn, 51 F.3d 1540, 1548 (11th Cir. 1995); see Id. at 234, 249.

Although the fragile emotional state of the defendant at the time consent was given is a factor bearing on the issue of voluntariness, it is not dispositive. Duran, 957 F.2d at 503. In Duran, the defendant argued that his wife's consent to search their home was coerced and involuntary based in part on her fragile emotional state at the time which was exacerbated by her failure to take her prescribed Prozac for about a week before her arrest. While recognizing that this factor bears on voluntariness, the court stated: Unless the "emotional distress is so profound as to impair [a person's] capacity for self-determination or understanding of what the police were seeking, it is not enough to tip the balance towards finding that her consent was involuntary." Id.

Detective Metz testified that, when questioned after being advised of his rights, the defendant said that there was some "crack" in his home but that it was not his. Detective Metz also said that the defendant told him that his girlfriend stayed at the residence with him, but that she knew nothing about the drugs. Although the defendant denied that he gave consent to search his home, the court finds the testimony of the officers more credible based on the totality of the testimony.

Detective Metz and the other officer would have no reason to wait until the defendant was brought to the police van to commence a search of his residence. If they were not going to obtain consent to search, they could just have begun the search after the drug deal was completed. However, the officers waited until the defendant was brought to the van, advised

of his constitutional rights, waived those rights and gave consent to search his home before commencing the search. When asked if there were drugs in his home, the defendant acknowledged that there were drugs in the residence, but that they were not his. He also made a point of explaining that his girlfriend, who resided there, was not involved with the drugs.

The record is devoid of any evidence that the officers coerced the defendant into giving consent to search his home. Rather, the record reflects that the defendant's consent to search was given knowingly, intelligently and voluntarily. Accordingly, this court will recommend that the defendant's motion to suppress statements and evidence seized be denied (Docket #13).

## **CONCLUSION**

**NOW, THEREFORE, IT IS HEREBY RECOMMENDED** that the United States district judge enter an order **denying** defendant Roy Lee Monette's motion to suppress custodial statements and any evidence seized from 3215 N. 29th Street, Milwaukee, Wisconsin (Docket #13).

Your attention is directed to 28 U.S.C. § 636(b)(1)(A) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any

- 15 -

objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 6th day of April, 2006.

BY THE COURT:

s/ Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge